UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MICHAEL MATTIA,

                    Plaintiff,                          Case Number 17-11169
                                                        Honorable David M. Lawson
v.

CITY OF CENTER LINE, MICHIGAN,
DENNIS CHAMPINE, in his official
capacity, and WILLIAM DEMPSEY, in
his official and individual capacity,

                    Defendants.
_____/

## OPINION AND ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION

Plaintiff Michael Mattia, a professed Christian who believes that abortion is wrong and violates the tenets of his religion, likes to share his opinions publically by displaying large signs at busy intersections depicting aborted fetuses. On one of these occasions, police officers for the City of Center Line ordered Mattia to desist displaying his sign and threatened to arrest him (he says) for breach of the peace if he didn't. Mattia complied, but then filed the present lawsuit alleging a violation of his First Amendment right to speak freely in a public forum. He now seeks a preliminary injunction allowing his activity. Mattia has demonstrated a likelihood of success on the merits of his claim, and because the other factors favor an injunction, the Court will grant the motion.

I.

The facts of the case are taken from the verified complaint and the motion papers, which include several declarations. Mattia alleges that he is a Christian who believes that terminating a pregnancy at any stage is the wrongful killing of an innocent person. He seeks to share with the

public his religiously-based beliefs about abortion.  His preferred method of communication is using handheld signs on public sidewalks next to well-traveled streets.  Mattia believes that in order accurately to convey his message about abortion, he must illustrate the physical consequences of the abortion procedure itself.  Consequently, the signs frequently include pictures of aborted fetuses. Mattia also includes his phone number on the sign to invite discussion about his views.

Mattia does not seek a crowd when he carries his sign, and he believes that a crowd is not likely to form.  He says that he does not obstruct access to public sidewalks or prevent others from passing.  His display does not obscure traffic signs or signals or otherwise interfere with the vision of drivers.  He does not solicit in any way or advocate for violence against abortion providers or supporters.

Mattia has engaged in this type of expression for almost two decades, primarily in Michigan. He carries his sign four or five days a week and for two to four hours a day.  He occasionally has interacted with police about his signs, but the police have never prohibited him from displaying his message.

In July 2016, Mattia moved his residence to Center Line, Michigan.  He continued to carry his signs pertaining to abortion on an almost daily basis.  One of his preferred display locations was a public sidewalk just south of Freeway I-696 in Center Line, where he held signs with images of aborted fetuses.  He did so without incident.

At around 5:00 p.m. on August 26, 2016, Mattia carried his sign on a public sidewalk at or near the intersection of East Ten Mile Road and Van Dyke Avenue in Center Line.  He chose that location because of the significant vehicular traffic passing through downtown Center Line.  His sign included a picture of an aborted fetus as the backdrop on each side.  Superimposed on the images

-2-

were the words "Abortion: God Forgives and Heals," and on the flip side, "God Forgives, Heals Abortion," "Women Do Regret Abortion," and "Men Regret Lost Fatherhood." The side with more text obscured more of the picture than the other side with just one phrase.

Mattia held the sign at chest level as he walked on the sidewalks adjacent to Ten Mile Road and Van Dyke. He flipped the sign around frequently so both sides were visible to those passing through the intersection. He says that he remained entirely on the sidewalk with his sign at all times without obscuring the visibility of traffic signs or signals. Soon after Mattia's arrival, an unidentified female approached Mattia at the intersection. She stood about five to seven feet away from him and held a sign stating something along the lines of "Don't listen to this guy," with an arrow pointing towards Mattia. Neither party tried to interfere with the other's expression, and the interaction was peaceful at all times. Mattia remained at this intersection for approximately one hour without disturbance. He did not notice any drivers experiencing difficulty passing through the intersection.

At around 6:00 p.m., Center Line police sergeant William Dempsey and Officer Andy Percha approached Mattia. Dempsey ordered Mattia to provide his driver's license and personal information. After reviewing Mattia's information, Dempsey told Mattia that he may not continue to display his sign, referencing complaints Dempsey had received about the messaging. Based on prior interactions with police officers, Mattia asserted his constitutional right to carry his sign. Dempsey replied that the First Amendment did not apply in this situation and proceeded to his police car to make a phone call. Officer Percha remained with Mattia during the phone call and prohibited him from displaying his sign.

Approximately 20 minutes later, Dempsey informed Mattia that he had discussed the sign issue with his superiors and that Mattia needed to leave the intersection, taking his sign with him. Mattia reiterated that he had a First Amendment right to display a sign in public even if someone takes offense at the message, but Dempsey disagreed. Dempsey explained that a sign with mere text would be within Mattia's right. Dempsey concluded that the sign containing an image of an aborted fetus is not constitutionally protected because it is "so shocking." He informed Mattia that a simple drawing that was not as "vile" or "grotesque" would be permitted, but because people had called and complained about Mattia's sign, it was not covered by the First Amendment. Dempsey added that Mattia's activity violated the law for disturbing the peace, having verified the matter with his superiors.

Mattia believed that the sergeant was mistaken. He referenced his prior interactions with law enforcement regarding his signs and their acknowledgment of his constitutional right to use that particular sign. He also mentioned legal precedent upholding his activity. Dempsey reiterated that Mattia was disturbing the peace and that he would have to move on. Mattia asked how he could cause a disturbance without interfering with pedestrian or vehicular traffic. Dempsey then reminded Mattia that because people had called the police to complain about his sign, Mattia had disturbed the peace on a "psychological" level. Dempsey told Mattia to forget about his First Amendment right because his activity was causing a disturbance in violation of the ordinance. Dempsey did not specifically cite any ordinance Mattia was allegedly violating. When Mattia asked to see the ordinance, Dempsey referred Mattia to a website containing city ordinances, advising him to look it up. Mattia then asked about the consequences he would suffer if he continued to carry his sign. Dempsey warned that he would be criminally cited or arrested for violating the breach of the peace

ordinance.  Believing he could not convey his message without his sign and fearing arrest, Mattia left the intersection around 6:30 p.m.  He has not displayed a sign on a public sidewalk in Center Line since that day.

Per Sgt. Dempsey's suggestion, Mattia subsequently researched the breach of the peace ordinance online and discovered Center Line ordinance section 46-146 (Breach of Peace), which states, "Any person who shall make or assist in making any noise, disturbance, trouble or improper diversion, or any rout or riot, by which the peace and good order of the city are disturbed, shall be guilty of a breach of the peace, and disorderly conduct."  Because Mattia was troubled by the ordinance's application to his sign use, he went to city hall to ask city manager Dennis Champine about its application to his activity.  Mattia requested a meeting with Champine, who met him in the lobby and ushered Mattia into a nearby conference room.  Champine then informed Mattia that he had spoken with Sgt. Dempsey about the matter and subsequently handed Mattia a copy of ordinance section 46-146.  Champine identified that ordinance as applicable to Mattia's sign use. Mattia explained that he was already familiar with the ordinance, but did not believe it should apply to his sign.  Champine acknowledged that the language in the ordinance is subjective, but informed Mattia that he would need to cite case law supporting his constitutional claim before Champine could instruct the police department to refrain from enforcing it against Mattia.  Champine additionally noted that responding to complaints about Mattia's sign display imposes a financial burden on the city.

Thereafter, Mattia, through counsel, sent a letter dated September 14, 2016 to Champine and the Center Line director of public safety, which included references to case law explaining why the ban on Mattia's sign use and the application of section 46-146 is unconstitutional.  The city replied

-5-

through its attorney by letter dated October 20, 2016, reiterating that Mattia will not be allowed to display his sign on any public sidewalk in the city. The letter did not address Mattia's concern about the application of section 46-146 to his sign use. Instead, the city cited various sections of Center Line ordinance section 1510 to support banning Mattia's signs. The letter included the following prohibitive language of section 1510:

> (3)(f)   No signs or billboards on any street corner which would obscure the vision of drivers using said streets, or conflict with the traffic-control signals at the intersection of any street.
> (3)(k)   Signs and billboards shall be expressly prohibited from all public rights-of-way and dedicated public easements.
> (4)(o)   Any sign that would project into any public right-of-way or other accessway.
> (4)(r)   Sidewalk signs.

Moreover, the letter stated that this section, construed and read together, "prohibits **all** signs, notwithstanding the content, displayed on any street corner, public right-of-way or sidewalk" (emphasis in letter). On that basis, the city concluded that Mattia's display of his sign on the public sidewalk is prohibited by ordinance section 1510.

Mattia believed the threat of criminal consequences remained and that the letter unequivocally informed him that the city would apply section 1510 to ban his desired future sign use. Moreover, the additional application of section 1510 banned Mattia's signs with images of aborted fetuses as well as his signs with mere text. Mattia says he now fears criminal sanction if he attempts to display his sign with images or any other sign conveying an abortion message on any public sidewalk. He believes the complete ban on his sign use restricts and deters his constitutionally-protected expression in traditional public fora and constitutes irreparable harm to him. Mattia also maintains that he has seen people regularly displaying signs on public sidewalks

-6-

in Center Line.  He noted that he saw someone on the sidewalk holding a sign advertising for Liberty Tax Services after he was banned from holding his sign.

Mattia filed the present action on April 13, 2017 under 42 U.S.C. §§ 1983 and 1988, alleging violations of the First and Fourteenth Amendments.  He challenges Center Line ordinance section 46-146 as applied to his conduct and Center Line ordinance section 1510 on its face and as applied.  On April 24, 2017, Matttia filed a motion for a preliminary injunction.  After the City responded, the Court heard oral argument on August 31, 2017.

## II.

As an initial matter, the defendants contend that the plaintiff lacks standing to raise his claims because he has not suffered an injury in fact.  They also argue that the plaintiff's challenge to ordinance 46-146 is moot because the defendants agreed to cease enforcement against the plaintiff.  In addition, the defendants also contend that city manger Champine and Sgt. Dempsey are entitled to qualified immunity.

### A.

The qualified immunity argument is easily dispatched at this stage of the proceedings.  The doctrine of "[q]ualified immunity shields government officials from monetary damages, not from injunctive relief.  *Ward v. Polite*, 667 F.3d 727, 742 (6th Cir. 2012).  Because the plaintiff seeks injunctive relief in the present motion, the defendants' defense of qualified immunity is wholly inapplicable.

### B.

The defendants' standing argument requires a bit more discussion.  Standing is required in order to confer subject matter jurisdiction upon federal courts under Article III of the Constitution.

It is "the threshold question in every federal case." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The Supreme Court has stated that the standing requirement "limits federal court jurisdiction to actual controversies so that the judicial process is not transformed into 'a vehicle for the vindication of the value interests of concerned bystanders.'" *Coal Operators & Assocs., Inc. v. Babbitt*, 291 F.3d 912, 915-16 (6th Cir. 2002) (quoting *Valley Forge Christian College v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 473 (1982)).

One of the three components necessary to establish standing to sue under Article III is the demonstration of an injury in fact. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (stating that a plaintiff also must show that the injury is "traceable" to the defendant's conduct, and the injury likely will be "redressed by a favorable judicial decision"). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo, Inc. v. Robins*, --- U.S. ---, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S. at 560). "For an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Ibid.* "A 'concrete' injury must be '*de facto*'; that is, it must actually exist." *Ibid.*

The injury Mattia identifies is the deprivation of his right to speak freely in a public place. That right was abridged, he says, when Sgt. Dempsey told him to terminate his sign-displaying activity, and confirmed when he received a letter from city manager Champine telling him that he would not be allowed to display his sign on any public sidewalk in the city. The defendants argue that Mattia suffered no injury because he ceased displaying his sign voluntarily, and there is no threat of pending prosecution.

Certainly, the First Amendment "offers sweeping protection [to] all manner of speech," even loathsome, "distasteful and highly offensive" speech. *Bible Believers v. Wayne Cty., Mich.*, 805 F.3d 228, 243 (6th Cir. 2015) (citing *Nat'l Socialist Party of Am. v. Vill. of Skokie,* 432 U.S. 43, 43-44 (1977) (recognizing First Amendment rights of Neo Nazis seeking to march with swastikas and to distribute racist and anti-Semitic propaganda in a predominantly Jewish community)). When that right is abridged, an injury occurs, even when there are no actual damages. *See Marohnic v. Walker*, 800 F.2d 613 (6th Cir. 1986) (holding that a plaintiff need not show actual injury to establish First Amendment violation); *Walje v. City of Winchester, Kentucky*, 773 F.2d 729, 732 (6th Cir. 1985) (same).

Mattia alleges that Sgt. Dempsey told him that if he did not quit displaying his sign, he would be cited for a violation of the ordinance and arrested. Dempsey disputes that assertion, stating in his affidavit that Mattia was not threatened with arrest. Leaving that aside, however, Mattia plainly was told by Champine and the city attorney that displaying his sign on *any* public sidewalk in Center Line violated city ordinances. And Mattia has expressed an intention to continue his anti-abortion messaging activity, even in the face of the prohibitive interpretation the city attorney declared in his letter.

A plaintiff establishes an injury-in-fact "when he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Kiser v. Reitz*, 765 F.3d 601, 608 (6th Cir. 2014) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). A threat of prosecution may be inferred where "a plaintiff has engaged in a course of conduct and the state has instructed him to stop or face disciplinary action." *Ibid*. There can be little doubt that Mattia intends

-9-

to persist in his activity, as he has in the past.  In that context, the Court "may infer a threat of prosecution that is neither 'chimerical,' nor 'imaginary or wholly speculative.'" *Ibid.*  (quoting *Steffel v. Thompson,* 415 U.S. 452, 459 (1974), and *Babbitt*, 442 U.S. at 302)

The defendants  rely on two cases to support the argument that the plaintiff alleges merely speculative injury.  The first, *Morrison v. Bd. of Educ. of Boyd Cty.*, 521 F.3d 602 (6th Cir. 2014), applies, they say, because Mattia supposedly chose voluntarily to stop displaying his sign.  In *Morrison*, the plaintiffs sought to invalidate a school's anti-harassment policies on the basis that the policies prevented students from expressing their religious views on homosexuality.  *Id*. at 607.  The Sixth Circuit held that the plaintiffs failed to show injury in fact because "the record [was] silent as to whether the school district threatened to punish or would have punished Morrison for protected speech in violation of its policy." *Id*. at 610.  Instead, the court concluded that "Morrison's choice to chill his own speech based on his perception that he would be disciplined for speaking" did not give him standing to challenge the policy.  *Ibid*.

The defendants fail to appreciate a key difference between *Morrison*'s facts and those here.  Unlike in *Morrison*, the record in this case supports a threat of prosecution.  Although the plaintiff's and Dempsey's accounts differ on a threatened arrest for violation of ordinance section 46-146, Dempsey plainly ordered Mattia to desist engaging in conduct Mattia insists was protected by the First Amendment.  And as noted earlier, the city's letter to the plaintiff unequivocally informs him that further display of his sign is prohibited by ordinance section 1510.   The plaintiff says that he has not engaged in similar speech since receiving the letter because he fears enforcement.  Those facts align this case more directly with *Kiser v. Reitz* than with *Morrison*.

The defendants also cite *American Civil Liberties Union v. Nat'l Security Agency*, 493 F.3d 644 (6th Cir. 2007). There, the Sixth Circuit held that the attorney-plaintiffs failed to allege an injury in fact because their fear was merely speculative that the NSA may intercept their privileged communications with overseas clients. *Id*. at 662. The injury alleged — chilling of First Amendment rights — did not derive from some form of direct government enforcement or regulation. *Ibid*. The plaintiffs could not show "something more" than subjective apprehension that the communications would be intercepted and that such interception would be detrimental to their clients. *Id*. at 664.

That case does not help the defendants. Mattia has shown something more than subjective apprehension of enforcement. The defendants insist that the plaintiff has never been threatened with enforcement of either ordinance. But the city sent Mattia a letter expressly prohibiting the display of his sign. Unlike the plaintiffs in *American Civil Liberties Union*, the plaintiff has demonstrated a clear threat of enforcement. The plaintiff has established an injury in fact.

## C.

The defendants also briefly argue that the plaintiff's challenge to Center Line ordinance section 46-146 is moot. That argument is based on a telephone call on April 21, 2017, in which the defendants' attorney allegedly informed the plaintiff's attorney that the city would not enforce section 46-146 against the plaintiff. The defendants argue that conversation moots the plaintiff's as-applied challenge to section 46-146. Not so.

"[A] defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs.(TOC), Inc.*, 528 U.S. 167,

190 (2000) (citing *United States v. Concentrated Phosphate Export Ass'n, Inc.*, 393 U.S. 199, 203 (1968)).  Moreover, "[i]t is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Id.* at 189 (internal quotations omitted).  If that were the case, the defendants would be free to resume their wrongful conduct.  *Ibid.* (citations omitted).

The parties here offer conflicting accounts of whether the defendants agreed to cease enforcement of Center Line ordinance section 46-146 against the plaintiff.  The defendants contend that the April 21, 2017 telephone promise, coupled with the lack of enforcement so far, satisfies their burden.  The plaintiff argues that the defendants' attorney made no unequivocal promise.  The plaintiff concedes that at some point during their communications, the defendants were willing to refrain from enforcing section 46-146.  But that conversation did not extend to ordinance section 1510, which the defendants insisted would be applied against the plaintiff.  The plaintiff understood the defendants' position as a temporary hiatus in enforcing section 46-146.  The controversy over the plaintiff's right to display his sign has not been resolved, and the issues raised in the motion for a preliminary injunction are still live.

III.

The criteria for obtaining a preliminary injunction are well known and undisputed by the parties. The relevant factors are whether (1) the moving party has demonstrated a substantial likelihood of success on the merits; (2) the moving party will suffer irreparable injury without the injunction; (3) the preliminary injunction will cause substantial harm to others; and (4) the public interest will be served if the injunction issues.  *Bays v. City of Fairborn*, 668 F.3d 814, 818-19 (6th Cir. 2012) (citing *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535,

542 (6th Cir. 2007)).  Although these factors are to be balanced, the failure to show a likelihood of success on the merits is generally fatal.  *Ibid.*; *see also Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 625 (6th Cir. 2000).  Moreover, "in a First Amendment case, the crucial inquiry is usually whether the plaintiff has demonstrated a likelihood of success on the merits. This is so because . . . the issues of the public interest and harm to the respective parties largely depend on the constitutionality of the statute." *Hamilton's Bogarts, Inc. v. Michigan*, 501 F.3d 644, 649 (6th Cir. 2007) (citations and quotation marks omitted).

The plaintiff has the burden of proof, and that burden is the same irrespective of whether the relief sought is mandatory or prohibitive. *United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Regional Transit Auth.,* 163 F.3d 341, 348 (6th Cir.1998).  Rule 65 of the Federal Rules of Civil Procedure authorizes the issuance of preliminary injunctions when appropriate.  It is appropriate here.

A.

Mattia argues that Center Line ordinance section 46-146 is unconstitutional as applied to him, and section 1510 is unconstitutional both on its face and as-applied against him.  At this stage of the case, he does not have to "prove his case in full."  *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007).  "[I]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997) (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir. 1985)).

-13-

Mattia asserts rights under both the First and Fourteenth Amendments. His First Amendment claim based on the Free Speech Clause is persuasive enough that the Court need not address his Fourteenth Amendment argument.

The Sixth Circuit has adopted a three-part inquiry to address free speech claims. "[F]irst, we determine whether the speech at issue is afforded constitutional protection; second, we examine the nature of the forum where the speech was made; and third, we assess whether the government's action in shutting off the speech was legitimate, in light of the applicable standard of review." *Bible Believers*, 805 F.3d at 242 (citations omitted).

There is no dispute here on the first two parts of the test. The parties agree that Mattia's expression about abortion, by use of his graphic signage, is protected speech. *See id.* at 243 (noting that "expressive behavior that is deemed distasteful and highly offensive to the vast majority of people . . . most often needs protection under the First Amendment"). The parties also agree that sidewalks (including the sidewalk where Sgt. Dempsey confronted Mattia) "are among those areas of public property that traditionally have been held open to the public for expressive activities and are clearly within those areas of public property that may be considered, generally without further inquiry, to be public forum property." *United States v. Grace*, 461 U.S. 171, 179 (1983).

The parties have focused their dispute on the third element. The defendants insist that they lawfully may prohibit Mattia's activity on the sidewalks within the city because the ordinances are content-neutral means of promoting safety and aesthetics. Both of those goals, they argue (correctly), have been recognized as legitimate government interests. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507-08 (1981).

-14-

First Amendment jurisprudence generally recognizes two types of speech restrictions in a public forum:  content-based restrictions; and content-neutral restrictions based on time, place, and manner.  A government entity seeking to justify content-based speech restrictions has a steep hill to climb.  "[I]t must show that its regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end."  *Perry Educ. Ass'n v. Perry Local Educators Ass'n*, 460 U.S. 37, 45 (1983).  The stringency of that standard has prompted the Sixth Circuit to observe that "content-based restrictions on constitutionally protected speech are anathema to the First Amendment and are deemed 'presumptively invalid.'"  *Bible Believers*, 805 F.3d at 248 (quoting *Ysura v. Pocatello Educ. Ass'n*, 555 U.S. 353, 358 (2009)).

Content-neutral regulations of the time, place, and manner of expression are permitted if they are "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."  *Perry*, 460 U.S. at 45.  To satisfy narrow tailoring, the regulation must not "burden substantially more speech than is necessary to further the government's legitimate interests."  *Ward v. Rock Against Racism*, 491 U.S. 799, 800 (1989).  Even if the regulation is not the least restrictive alternative, it still may be upheld as valid "[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest." *Id.* at 781.  However, the government additionally must demonstrate that ample alternative channels of communication remain open.  This requirement is not met "'if the speaker is not permitted to reach the intended audience.'"  *Saieg v. City of Dearborn*, 641 F.3d 727, 740 (6th Cir. 2011) (quoting *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1229 (9th Cir. 1990)).  Nonetheless, "speakers are not entitled to their best means of communication.'" *Ibid.* (internal quotations omitted).

-15-

With these guidelines in mind, the Court turns to each of the two ordinances challenged in this lawsuit.

1.

First, section 46-146. That states: "Any person who shall make or assist in making any noise, disturbance, trouble or improper diversion, or any rout or riot, by which the peace and good order of the city are disturbed, shall be guilty of a breach of the peace, and disorderly conduct."

The plaintiff argues that the defendants impermissibly applied this section against him based on the content of his sign. In his verified complaint and supporting affidavit, Mattia contends that Sgt. Dempsey told him that the police had received complaints about his sign. According to Mattia, Dempsey explained that a sign with text and without a picture of an aborted fetus would be permissible. Dempsey described his sign as "so shocking" that it is not given constitutional protection. And Dempsey concluded, says Mattia, that his sign was disturbing the peace by inspiring calls to the police, declaring that the sign was disturbing on a "psychological level." The plaintiff also says that Dempsey told him that a drawing not as "vile" or "grotesque" as the image on the plaintiff's sign would be allowed. When Mattia asked Dempsey if he could see the ordinance he was violating, Dempsey referred him to a website containing city ordinances. Mattia later understood the ordinance in question to be section 46-146, which prohibited breaches of peace, and that understanding was confirmed by city manager Champine during their meeting.

The defendants offered rebuttal affidavits from both Dempsey and city manager Champine. Dempsey wrote that the city received complaints about the sign, but at the time, he did not know the substance of those calls. He said that upon arrival at the intersection, it was "clear" that the plaintiff's sign was causing traffic flow and traffic safety issues, although he did not elaborate. He

-16-

admitted to feeling concerned about breach of peace. Champine averred that he understood the issue with the plaintiff's sign to be about traffic safety at the intersection. Neither affidavit points to specific incidents of traffic issues from that day stemming from the plaintiff's activity. Dempsey offered a brief and conclusory account of what happened, but that is insufficient to contradict the plaintiff's assertion that he was stopped because of what was on his sign.

In his reply, the plaintiff furnished a short video that captures the exchange between the plaintiff and Sgt. Dempsey on August 26, 2016. The plaintiff shot the video on his cell phone. The video corroborates Mattia's account of what happened and calls Dempsey's credibility into question. Although at times the sound is muffled by wind, it is clear from the recording that Dempsey did use the words "so shocking," "vile," and "grotesque" with respect to the plaintiff's sign. When the plaintiff asked how he was disturbing the peace, Dempsey simply responded that people were calling and complaining. Dempsey did not identify any specific traffic issues. Moreover, the intersection and flow of traffic is visible on the video, and it does not appear that there were any traffic issues at the time of recording.

Based on the evidence presented by both sides, it is difficult to identify the defendants' prohibition against the plaintiff's sign display as anything but a content-based restriction. The defendants argue that the text of section 46-146 is content-neutral. They argue that the ordinance was adopted with a content-neutral purpose and that it is supported by a significant government interest in public safety. But here, that is largely beside the point. As in *Bible Believers*, where the police enforced a similar ordinance against an evangelical Christian group whose offensive anti-Islamic demonstration was cut off at a festival celebrating Arab culture, it was "irrelevant whether the [police's plan was] content-neutral because the officers enforcing it [were] ordained with broad

-17-

discretion to determine, based on listener reaction, that a particular expressive activity [was] creating a public danger." *Bible Believers*, 805 F.3d at 247. The court found "[i]t . . . indisputable that the [police] acted against the Bible Believers in response to the crowd's negative reaction. *Ibid.* Such is the case here.

It is quite obvious that the Center Line police enforced section 46-146 against Mattia based on viewer reaction. The ordinance does not define what amounts to a disturbance, trouble, or improper diversion. And the record indicates that Dempsey could not point to any identified disturbance other than the complaints received. He emphasized that the shocking content of the plaintiff's sign motivated the calls, and that amounted to disturbing the peace. As the Sixth Circuit noted in *Bible Believers*, this type of "heckler's veto is precisely that type of odious viewpoint discrimination" the First Amendment safeguards against. 805 F.3d at 248 (citations omitted). Because content-based restrictions are "presumptively invalid," *ibid.*, the plaintiff has shown a strong likelihood of success on the merits of this claim.

2.

The plaintiff mounts both a facial and as-applied First Amendment challenge to section 1510. A facial challenge presents the plaintiff with a formidable task. It is "a remedy that courts employ 'sparingly and only as a last resort.'" *Fieger v. Michigan Supreme Court*, 553 F.3d 955, 960 (6th Cir. 2009) (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973)). But because the plaintiff can demonstrate a likelihood of success on his as-applied argument, the court need not address the ordinance's facial invalidity in the present motion.

Mattia acknowledges that the text of section 1510 is content-neutral. He insists, however, that the ordinance is unconstitutional as applied to him because it is not narrowly tailored to serve

-18-

a substantial government interest (it necessarily overburdens free speech by banning all sidewalk signs), and the ordinance fails to leave open ample alternative channels of communication. The defendants contend that the restriction is justified because the driver distractions that sidewalk signs create are a threat to public safety.

The problem with the defendants' argument is illustrated by the city attorney's letter where he interpreted the several subsections of ordinance 1510, read together, to mean that the law "prohibits **all** signs, not withstanding the content, displayed on any street corner, public right-of-way or sidewalk" (emphasis in letter). Considering that public sidewalks are traditional public fora, that restriction is manifestly overinclusive: it burdens substantially more speech than necessary. *Ward*, 491 U.S. at 800. It is not difficult to imagine a narrower interpretation that would allow the display of a protest sign, but would restrict the sign's size, or limit display within a certain distance from the intersection, or even curtail some of the activity during rush hour on the city's main streets. But none of that was even suggested by the city's letter, which enforced section 1510 as "strong medicine," *Broadrick*, 413 U.S. at 613, that "le[ft] nothing standing," *Warshak v. United States*, 532 F.3d 521, 528 (6th Cir. 2008) (en banc) (discussing a facial challenge).

As noted above, the city has identified legitimate governmental interests for its restrictions: traffic safety and aesthetics. But even if the ordinance were narrowly tailored to achieve those ends, the record undermines the defendants' asserted justifications. They offer only a conclusory argument that a sign like the plaintiff's causes traffic issues; they have not shown that the plaintiff's sign actually caused traffic issues. Sgt. Dempsey averred in his affidavit that it was "clear" at the intersection that the plaintiff's sign was interfering with traffic. But in the plaintiff's video, it is not apparent that there are any traffic issues, nor did Dempsey refer to anything specific.

The defendants rely on *Frye v. Kansas City Missouri Police Dep't*, 375 F.3d 785, 788 (8th Cir. 2004), but that does not help them, because there, unlike here, the police observed *actual* traffic issues caused by the anti-abortion demonstration. "All of the motorists complained that viewing the graphic photographs had impaired their ability to 'safely and properly control their vehicles.'" *Ibid.* And in that case, the police asked the demonstrators to relocate rather than modify their signs, which the court found to be "reasonable restrictions on the location of the signs in order to protect public safety." *Id.* at 790. There is no evidence from motorists on this record. And Dempsey not only failed to identify actual traffic issues, but also suggested that the plaintiff change the content of his sign to comply with an ordinance — presumably the breach of peace ordinance. And then the city's letter imposed a total ban on sign displays on *all* city sidewalks under section 1510. Even though a court need not determine the availability of alternative channels of communication when the content-neutral restriction is overbroad, *Saieg*, 641 F.3d at 740 ("The requirements for a time, place, and manner restriction are conjunctive."), a complete ban on sidewalk signs cannot be said to leave open any alternative channels of communication. Mattia has demonstrated the likelihood of success on his as-applied challenge to section 1510 because of the breadth of the ordinance and its panoptic muffling effect.

## B.

According to the Sixth Circuit, "'despite the overall flexibility of the test for preliminary injunctive relief, and the discretion vested in the district court, equity has traditionally required a showing of irreparable harm before an interlocutory injunction may be issued.'" *Nat'l Viatical, Inc. v. Universal Settlements Int'l, Inc.*, 716 F.3d 952, 957 (6th Cir. 2013) (internal marks omitted) (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 103 (6th Cir. 1982)). Even

with that prescription, the Supreme Court has declared that "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

The plaintiff contends that he will be unable to exercise his right of free speech on public sidewalks because of the threat of prosecution in the absence of this preliminary injunction. He says that Sgt. Dempsey clearly warned him of the criminal consequences if he continued to display his sign. Additionally, in the letter to the plaintiff dated October 20, 2016, the city's attorney, on behalf of the city, advised the plaintiff that his display of his sign on any public sidewalk is prohibited by Center Line ordinance section 1510. The plaintiff reasonably believes he will face arrest or some other criminal sanction if he continues to carry his sign publicly.

The defendants argue that the plaintiff will not suffer irreparable injury because the two city ordinances are constitutional, and therefore the plaintiff cannot suffer any deprivation of First Amendment freedoms. They also contend that the plaintiff's fear of criminal sanction is based on a subjective belief of enforcement. Sgt. Dempsey concedes that the plaintiff was told to leave the intersection, but maintains that he did so voluntarily. The defendants contend that the city has never threatened prospective enforcement of the ordinances against the plaintiff.

Although there is a conflict between Mattia's and Dempsey's affidavits on the tenor of the discussion of criminal sanction at the intersection, the plaintiff's video clears that up in his favor. So does the city's letter, which states unequivocally that the plaintiff's display of his sign is prohibited by ordinance 1510. The plaintiff therefore has demonstrated a threat to his First Amendment interests sufficient to show irreparable harm. *See Elrod*, 427 U.S. at 373 (finding an

irreparable injury where "First Amendment interests were either threatened or in fact being impaired, . . . for even minimal periods of time").

### C.

The defendants do not argue that the injunction will cause substantial harm to others. Instead, they contend that the challenged ordinances are constitutional and that the plaintiff has not and will not suffer any concrete injury. But in the Sixth Circuit, "'if the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere its enjoinment.'" *Bays*, 668 F.3d at 825 (quoting *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville and Davidson Cnty.*, 274 F.3d 377, 400 (6th Cir. 2001)).

The plaintiff has satisfied his burden of showing a likelihood of success to his first Amendment challenges to both ordinances. And mere compliance with constitutional principles will inflict no harm on the defendants. This factor also favors the plaintiff.

### D.

The defendants argue that the public interest will not be served by the issuance of an injunction because the ordinances do not violate the plaintiff's constitutional rights. They also argue that an injunction would be detrimental to the public interest because it would prevent enforcement of laws supported by legitimate government purposes. However, in finding that the plaintiff likely will succeed on the merits, the Court has concluded otherwise.

The Sixth Circuit has found that "'it is always in the public interest to prevent violation of a party's constitutional rights.'" *Deja Vu of Nashville*, 274 F.3d at 400 (quoting *G & V Lounge, Inc. v. Michigan Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1994)). Where the public interest is involved, "equitable powers assume an even broader and more flexible character than

when only a private controversy is at stake." *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946).

This factor favors the plaintiff.

IV.

The plaintiff has demonstrated an injury in fact and has standing to proceed with his claims. None of them are mooted by the defendants' later actions. Qualified immunity does not prohibit the issuance of a preliminary injunction. The relevant factors favor the issuance of a preliminary injunction to prevent the defendants from interfering with the plaintiff's exercise of his First Amendment speech rights.

Accordingly, it is **ORDERED** that the plaintiff's motion for a preliminary injunction [dkt. #6] is **GRANTED**.

It is further **ORDERED** that defendants City of Center Line, William Dempsey, Dennis Champine, and all those in active concert or participation with them who receive actual notice of this injunctive order, are **RESTRAINED, ENJOINED, AND PROHIBITED** from applying Center Line city ordinances 46-146 or 1510 to ban the constitutionally protected speech of the plaintiff, Michael Mattia, on public sidewalks, including his use of expressive sign displays, during the pendency of this case or until further order of the Court.

s/David M. Lawson              <br>
DAVID M. LAWSON<br>
United States District Judge

Dated:   December 18, 2017

-23-

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on December 18, 2017.

s/Susan Pinkowski
SUSAN PINKOWSKI